UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

D.W. *by her parent, D.M.*;
D.M. *individually and on behalf of D.W.*;
E.V. *by his parent, S.V.*;
S.V. *individually and on behalf of E.V.*;
K.W.H. *by his parent K.M.S.H.*; *and*
K.M.S.H. *individually and on behalf of K.W.H.*;
*on behalf of themselves and all others similarly situated*,

           Plaintiffs,

*– against –*

NEW YORK CITY DEPARTMENT OF
EDUCATION and DAVID C. BANKS,
*in his official capacity as Chancellor of the New
York City Department of Education*,

           Defendants.

**OPINION & ORDER**

23 Civ. 3179 (ER)

RAMOS, D.J.:

    This class action was brought by D.W., D.M., E.V., S.V., K.W.H., and K.M.S.H., on behalf of themselves and all others similarly situated, against the New York City Department of Education ("DOE") and Chancellor David Banks, in his official capacity (collectively "Defendants"), alleging that Defendants' systemic delays in providing, or ensuring the provision of, special education services to Plaintiffs, has denied them and other families in the New York City public school system the educational services to which they were entitled under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA") and its analogues under the New York Education Law, N.Y. Education Law § 4401 *et seq.* Plaintiffs additionally allege violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.* ("ADA"), and a state breach of contract claim. Doc. 1 ¶¶ 125–166. Before the Court is Defendants' motion to

dismiss all claims.  Doc. 65.  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.    STATUTORY FRAMEWORK

### A. The IDEA and New York Regulations

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A). The statute mandates that any state receiving federal funds must provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 580 U.S. 386, 390 (2017).  The FAPE provided by the state must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be "reasonably calculated to enable the child to receive educational benefits."  *Endrew F.*, 580 U.S. at 394.

A public school ensures that a student with disabilities receives a FAPE by providing the student with a uniquely tailored Individualized Education Plan ("IEP").  *Id.* at 391; *see* 20 U.S.C. § 1401(9).  An IEP is a written statement, collaboratively developed by the parents of the child, educators, and specialists, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *M.O. v. N.Y.C. Dep't of Education*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v. N.Y.C. Dep't of Education*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute.  *Walczak v. Florida Union Free School District*, 142 F.3d 119, 123 (2d Cir. 1998).  The IDEA further mandates that the FAPE "meet the standards of the State educational agency."  20 U.S.C. § 1401(9)(B).  In New York, the

task of developing an IEP rests with local Committees on Special Education ("CSEs"), whose members are appointed by the board of education or trustees of the school district. *Walczak*, 142 F.3d at 123 (citing N.Y. Education Law § 4402(1)(b)(1); *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E.*, 694 F.3d at 175 (citing N.Y. Education Law § 4402(1)(b)(1)(a)). "In developing a child's IEP, the CSE is required to consider four factors: '(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs.'" *E.A.M. v. New York City Dep't of Education*, No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1 (S.D.N.Y. Sept. 29, 2012) (quoting *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 107–08 (2d Cir. 2007)).

To provide a FAPE, an IEP must be "reasonably calculated to enable the child to receive educational benefits," "likely to produce progress, not regression," and afford the student with an opportunity to achieve greater than mere "trivial advancement." *Cerra v. Pawling Central School District*, 427 F.3d 186, 194, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 129–30). The IEP includes, among other things, "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," and "a description of how the child's progress toward meeting the annual goals . . . will be measured." 20 U.S.C. § 1414(d)(1)(A)(i)(II), (III).

"Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig v. Doe*, 484 U.S. 305, 311 (1988). "States are required to develop procedural safeguards to 'guarantee parents . . . an opportunity for meaningful input into all decisions affecting their child's education[.]" *Board of Education of Pawling Central School District v. Schutz*, 290 F.3d 476, 481 (2d

Cir. 2002) (quoting *Honig*, 484 U.S. at 311–12).  As a result, states must allow parents "to seek review of any decisions they think inappropriate." *Id.*  "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential,'" *Cerra*, 427 F.3d at 195 (quoting *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 199 (1982)), or "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (citation omitted).  Rather, the IDEA calls only for selection of a program that provides a "basic floor of opportunity." *Walczak*, 142 F.3d at 132 (quoting *Rowley*, 458 U.S. at 201); *see id.* at 130 ("IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP.").

IEPs are "based in significant part on the results of statutorily mandated evaluations of the child." *D.S. By & Through M.S. v. Trumbull Board of Education*, 975 F.3d 152, 157 (2d Cir. 2020) (citations omitted).  Specifically, "[u]nder the IDEA, a child with a suspected disability must receive a 'full and individual initial evaluation' to determine the existence and extent of their disability and whether they are entitled to special education and related services under the Act." *Id.* (quoting 20 U.S.C. § 1414(a)(1)).  After that initial evaluation, the child is entitled to a "reevaluation" at least once every three years, and not more than once per year—unless otherwise agreed by the parent and school district—"for the purpose of updating their IEP." *Id.*; *see also* §§ 1414(a)(2)(B)(ii), (d)(4)(a)); *D.S.*, 975 F.3d at 157 n.1.  "[A] child's IEP Team must review their IEP 'periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved.'" *Id.* at 157 (quoting § 1414(d)(4)(A)).  Plaintiffs provide that, absent a parent's agreement to the contrary, "[i]nitial evaluations and reevaluations must be completed by the [DOE] within 60 days of [the DOE's] receipt of parental consent to evaluate the child, or receipt of the request for reevaluation, respectively." Doc. 1 ¶ 40 (citations omitted); *see* 20 U.S.C. § 1414(a)(1)(C)(i)(I); 8 N.Y.C.R.R. § 200.4(b)).

If the parent of a disabled child "disagrees with an evaluation obtained by the public agency," the parent is entitled to a publicly funded independent educational evaluation ("IEE"). *D.S.*, 975 F.3d at 158 (quoting 34 C.F.R. § 300.502(b)(1)); *see also* § 300.502(a)(3)(i) (defining IEE as "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question."). If a parent requests a publicly funded IEE, "the public agency must, without unnecessary delay," either file a Due Process Complaint ("DPC") "to request a hearing to show that its evaluation is appropriate," or "[e]nsure that an [IEE] is provided at public expense." *D.S.*, 975 F.3d at 158 (alterations in original) (quoting 34 C.F.R. § 300.502(b)(2)). This IDEA process for IEEs "attempts to level the playing field between parent and government by securing a parent's ability to obtain an independent assessment of their child's disability if the school's [sic] fall short." *Id.* It gives parents "access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion." *Id.* (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60–61 (2005)). Plaintiffs state that "common IEEs include neuropsychological examinations and 'related services,' evaluations such as speech and language assessments, physical therapy ('PT'), occupational therapy ('OT'), and assistive technology ('AT') evaluations." Doc. 1 ¶ 29 (citation omitted).

In addition to imposing the IEP requirement, the IDEA provides for due process procedures to promptly resolve disputes that arise between parents and school districts, so that children will receive appropriate special education services. 20 U.S.C. § 1415(b)(6)–(b)(7). New York State has implemented a two-tiered system of administrative review for disputes regarding "any matter relating to the identification, evaluation or educational placement" of a student with a disability "or the provision of a [FAPE]" to such a student. § 1415(b)(6)(A); *see also* 8 N.Y.C.R.R. § 200.5(i)(1). First, parents "who wish to challenge their child's IEP as insufficient under the IDEA may file a [DPC], requesting an impartial hearing before an [Independent Hearing Officer] [("IHO")], appointed by the

local board of education." *Hidalgo v. Porter*, No. 21 Civ. 10794 (JGK), 2023 WL 8810276, at *2 (S.D.N.Y. Dec. 20, 2023) (citing *Walczak*, 142 F.3d at 122)). Either party may then appeal the IHO's decision to a New York State Review Officer ("SRO"), and the SRO's decision can be appealed to either state or federal district court. *Id.* (citing *Walczak*, 142 F.3d at 122–23; 20 U.S.C. §§ 1415(g), 1415(i)(2)(A); and N.Y. Education Law § 4404(2)).

Within 15 days of receiving a DPC notice from a parent, the school district is required to convene a "resolution meeting." 8 N.Y.C.R.R. § 200.5(j)(2)(i). Plaintiffs provide that, during or after a resolution meeting, the DOE and parent may opt to enter into a "Resolution Agreement," a formal legally binding agreement in which, "in exchange for the [DOE's] promise to provide certain agreed upon evaluations or services, the parent will withdraw all or part of their formal DPC and give up their due process right to have their formal DPC heard at an impartial hearing." Doc. 1 ¶¶ 34, 35. Plaintiffs additionally state that, "[p]er [DOE] policy, if an IEE request is approved via Resolution Agreement, the [DOE] will issue an Assessment Authorization ('AA-2' form)," which independent evaluators must complete in order to receive payment. *Id.* ¶ 37 (citing New York City Dep't of Education, Special Education Standard Operating Procedures Manual, at 32–33 (Nov. 16, 2021)).

### B. Section 504 Claims

Section 504 of the Rehabilitation Act of 1973 prohibits an entity that receives federal financial assistance, like a school district, from discriminating against a student solely on the basis of a disability, providing:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). The "IDEA and Section 504 are complementary, but they address different injuries and thus require different proof. Specifically, Section 504 offers relief

from discrimination, whereas IDEA offers relief from inappropriate educational placement, regardless of discrimination." *Gabel ex rel. L.G. v. Board of Education*, 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005).

"A plaintiff may assert a Section 504 claim in conjunction with an IDEA claim on the theory that he has been denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive." *D.C. ex rel. E.B. v. N.Y.C. Dep't of Education*, 950 F. Supp. 2d 494, 517 (S.D.N.Y. 2013) (citation omitted). "To recover under the Rehabilitation Act, there must be evidence that: (1) the student is disabled; (2) the student is otherwise qualified to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from participation in programs at, denied the benefits of, or subject to discrimination at, the school on the basis of her disability." *Id.* at 518 (quoting *Schreiber v. East Ramapo Central School District*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010)).

"Since Section 504 relief is conditioned on a showing of discrimination, it requires something more than proof of a mere violation of IDEA—*i.e.*, more than a faulty IEP." *Gabel*, 368 F. Supp. 2d at 334 (citing *J.D. v. Pawlet School District*, 224 F.3d 60, 70 (2d Cir. 2000)). Rather, a plaintiff must prove some additional level of "intentional discrimination," which "may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE." *Id.*

### C. ADA

Like Section 504, the ADA prohibits discrimination based on disability, providing:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. There are no specific ADA regulations which address the education of children with disabilities; "[h]owever, the ADA has been interpreted co-extensively

with Section 504 special education requirements." *R.B. ex rel. L.B. v. Board of Education of City of New York*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000) (citing 28 C.F.R. § 35.103(a) (the ADA "shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973.")); *Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003) (discussing that the requirements of the ADA "apply with equal force to discrimination claims brought under the Rehabilitation Act.").

## II.    BACKGROUND

The following facts are drawn from allegations contained in the complaint, Doc. 1, which the Court accepts as true for purposes of the instant motion. *See Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006).

### A.  Factual Background

#### 1.  General Allegations

Plaintiffs allege that, since at least 2018, Defendants have been responsible for delays in (i) providing special education evaluations directly to students ("DOE Evaluations") and in (ii) responding to requests for IEEs.  Doc. 1 ¶ 3.  Plaintiffs claim that Defendants' delays deprive thousands of New York City students with disabilities— including the named plaintiffs and putative class members—of their right to a FAPE under federal and state law.  *Id.* ¶ 2.

Plaintiffs argue that the delays in obtaining evaluations result in students being inappropriately classified and/or placed in non-suitable classrooms and programs, which undercuts their educational and developmental progress.  *Id.* ¶ 4.  Therefore, Plaintiffs state, the delays exacerbate the students' underlying disabilities and "eliminate[] any chance of educational progress."  *Id.* ¶ 2.

Plaintiffs allege that Defendants' delays have forced hundreds of families to file DPCs in order to obtain evaluations, assessments, and services.  *Id.* ¶ 5.  For example, they provide:

> Families that request an IEE—such as a neuropsychological evaluation, speech-language evaluation, or occupational therapy evaluation—often receive no response from the individuals at their child's school, which is responsible for providing a response. This lack of timely response, often for weeks or months, forces parents to file a DPC against the [DOE] solely to obtain an evaluation.

*Id.* The DOE often seeks to settle—or partially settle—these DPCs, instead of engaging in the "lengthy impartial hearing process." *Id.* ¶ 6. Through these settlements, which are legally binding resolution agreements with the DOE, the families "giv[e] up their right to have their claims heard by an impartial arbiter" in exchange for "guaranteed evaluations." *Id.* However, Plaintiffs claim, the DOE "does not abide by the timelines [it] itself negotiated in those agreements." *Id.*

Moreover, even where the DOE has agreed to fund IEEs, independent providers experience months-long delays in receiving payment for evaluations and services rendered. *Id.* ¶ 7. Plaintiffs claim that these delays produce harmful downstream effects on low-income students with disabilities, because the failure to timely pay independent providers—sometimes for over a year—makes them "understandably . . . less willing" to service students in the public school system, as opposed to students whose families can pay out-of-pocket for evaluations. *Id.* Therefore, IEE providers have delayed or refused to provide services to DOE students because of the DOE's systemic delays in compensating them. *Id.* ¶ 103. Put differently, the DOE's payment delays ultimately "limit[] the pool of providers who are willing to contract with the City of New York to deliver critical special education services." *Id.* ¶ 7.[1]

For example, one neuropsychologist and solo practitioner, "Provider 1," whose "only source of revenue . . . is conducting IEEs," and "who primarily contracts with the [DOE]," "was at one point owed over $50,000 for past IEEs performed, and waited

---

[1] Plaintiffs provide that "the majority of students with disabilities in New York's public school system are low-income and their families cannot afford to pay for IEEs out of pocket." *Id.* ¶ 8. They state that "51% of students in the City system who are entitled to a special education program and related services live in a low-income neighborhood," and, for example, "over 80% of students in [DOE] schools with [IEPs] were eligible for a free or reduced lunch program in 2021." *Id.*

approximately six months to a year for the [DOE] to remit payment on these services." *Id.* ¶ 106. Plaintiffs state that "[t]hese extended payment delays have endangered the viability of Provider 1's practice and has led her to doubt whether she can continue to serve low-income students with disabilities from [DOE] schools." *Id.* ¶ 107. Two other providers, Provider 2 and Provider 3, have also experienced detrimental delays in being compensated by the DOE, as further discussed below. *Id.* ¶¶ 79, 96. Another service provider, "Provider 4," who specializes in one-on-one tutoring and has "experienced delayed payments for several months at a time for services provided to disabled [DOE] students," has been left "with no choice but [to] temporarily and potentially permanently stop providing tutoring services to disabled students who are unable to pay up front, out-of-pocket," because of the delays. *Id.* ¶¶ 108, 109. "Provider 5," a neuropsychologist who "has waited over 16 months to receive payment from the [DOE] for completed IEEs," is "reluctant to accept IEE referrals from the NYCDOE in light of these payment delays." *Id.* ¶¶ 110, 111. Therefore, as a result of the DOE's payment delays, students are often "unable to find evaluators willing to accept them and perform their evaluations," and thus they are "prevented from timely receiving the IEEs they are entitled to, and their educators are not given the information needed to provide them with necessary, appropriate special education services." *Id.* ¶ 112.

### 2. *Named Plaintiffs*

Student Plaintiffs D.W., E.V., and K.W.H. and are public school students eligible to receive special education services. *Id.* ¶¶ 12–14. Each is a "child with a disability within the meaning of the IDEA," and a "qualified individual with a disability within the meaning of Section 504 and the ADA," because each has a "physical or mental impairment that substantially impairs a major life activity." Doc. 1 ¶¶ 54, 70, 90; *see also id.* ¶¶ 141, 151. D.W., E.V., and K.W.H. are minor children, and along with their parents—parent Plaintiffs D.M., S.V., and K.M.S.H., respectively—they are New York City residents. *Id.* Additional details about each named Plaintiff are provided in turn.

*a.  D.W.*

D.W. is a 12-year-old who identifies as Black and is in the seventh grade.  *Id.* ¶ 51.  D.W. has been diagnosed with a hearing impairment, intellectual disability, and attention-deficit/hyperactivity disorder ("ADHD").  *Id.* ¶ 53.  D.W. exhibits difficulties stemming from inattentiveness, impulsivity, and problems with self-regulation, and she is frequently unable to finish lessons due to lack of focus and inattentiveness.  *Id.*

In October 2020, D.W. received an independent neuropsychological evaluation which recommended that she receive OT and PT assessments.  *Id.* ¶ 55.  It also recommended that she be provided with AT, to make reading and writing less stressful for her and to help her with reading comprehension.  *Id.*

D.M. is D.W.'s father.  *Id.* ¶ 52.  Following D.W.'s October 2020 evaluation, D.M. "grew increasingly concerned about the [DOE's] failure to timely provide D.W. with AT, PT, and OT evaluations."  *Id.* ¶ 56.  D.W.'s family noticed that she was "demonstrating issues relating to grasping and navigating safely, due to toe-walking."  *Id.*

In February 2021, D.W.'s family sent requests to DOE employees for PT and OT IEEs, as well as an AT evaluation.  *Id.* ¶ 57.  However, the DOE did not respond to these requests, nor did it provide the requested evaluations or services.  *Id.*  As a result of these failures, as well as the DOE's failure to provide related compensatory services, D.W.'s family submitted a DPC against the DOE on March 17, 2021.  *Id.* ¶ 58.

On May 26, 2021, the DOE and D.W. partially resolved D.W.'s claims by entering into a Resolution Agreement (the "D.W. Resolution Agreement"), which is "legally binding and [] enforceable in any . . . district court of the United States."  *Id.* ¶ 59.  In the D.W. Resolution Agreement, the DOE agreed to conduct an AT evaluation and to fund OT and PT IEEs "within thirty days from date of execution of th[e] agreement," that is, by June 26, 2021.  *Id.* ¶ 60.  However, the DOE did not complete the AT evaluation within thirty days.  *Id.* ¶ 60.

On August 5, 2021, over two months after the D.W. Resolution Agreement was executed, the DOE completed the AT evaluation. *Id.* ¶ 62. The AT evaluation concluded that D.W. required an AT device—a tablet with support for word processing, word prediction, auditory feedback dictation, e-text reader, and PDF annotations. *Id.* Plaintiffs claim that the DOE's failure to complete the AT evaluation on the timeline provided by the D.W. Resolution Agreement caused D.W. to be "without an AT device for two additional months after the [DOE] agreed to provide the AT evaluation." *Id.* ¶ 64. They argue that the DOE's "failure to timely provide D.W. the evaluations led to a delay in services she is entitled to as a result for [sic] her disability, and prevented her from completing her schoolwork, which caused her to fall further behind in school." *Id.* Therefore, Plaintiffs argue, the DOE "denied D.W. a FAPE and caused her to suffer substantial educational harm." *Id.*

On August 29, 2021, the PT IEE was conducted, and on September 19, 2021, the OT IEE was conducted. *Id.* ¶ 63. Plaintiffs claim that these IEEs were delayed in part because of "a lack of availability of evaluators who were willing and able to perform the PT and OT evaluations." *Id.*

Plaintiffs allege that "[i]n its failure to act, the [DOE] acted with deliberate indifference to the strong likelihood that D.W.'s right to a FAPE would be violated through its delay in timely compensating the independent evaluator ('Provider 1')." *Id.* ¶ 65.

    *b. E.V.*

E.V. is a 16-year-old in the eleventh grade. *Id.* ¶ 85. E.V. has been diagnosed with a speech and language disorder, specific learning disorder, childhood lead exposure, and generalized anxiety disorder. *Id.* ¶ 87. He received the first of these diagnoses when he was just 18 months old. *Id.*

As a result of his disabilities, E.V. has difficulty speaking, communicating, reading, writing, and learning. *Id.* E.V. has struggled academically for years; for

example, according to testing from December 2019, when E.V. was in eighth grade, he was reading at a second-grade level. *Id.* E.V. struggles mentally and emotionally because he is unable to keep up and compete in school, and he often shuts downs completely in school due to these struggles. *Id.* ¶ 88. E.V. exhibits difficulties in large group settings, such as the classroom, and he also struggles with concept comprehension and completion of classwork. *Id.*

E.V. first received an IEP in pre-school, and he currently has an IEP. *Id.* ¶ 89. In order to fully participate in school, E.V. requires speech therapy, counseling, one-on-one tutoring in multiple subjects, including math, and testing accommodations, as well as an appropriate placement. *Id.* ¶ 91. Plaintiffs state that although E.V. has received certain services to date, including some speech therapy, he "has been denied other necessary and appropriate services." *Id.*

S.V. is E.V.'s parent. *Id.* ¶ 86. Leading up to October 2020, "E.V.'s mother was growing increasingly concerned about, among other things, E.V.'s struggles with speech and that his IEP did not provide adequate speech-related services." *Id.* ¶ 92.

On October 20, 2020, the family filed a DPC against the DOE, requesting, "among other things, that the IHO order the [DOE] to provide E.V. with an independent speech-language evaluation." *Id.*

On February 11, 2021, the DOE and S.V. partially resolved S.V.'s and E.V.'s claims by entering into a Resolution Agreement (the "E.V. Resolution Agreement"), which is "legally binding and [] enforceable in any . . . district court of the United States." *Id.* ¶ 93. In the E.V. Resolution Agreement, the DOE agreed to pay for an independent speech evaluation in an amount not exceeding $2,100, "[u]pon receipt of a comprehensive evaluation and invoice from a licensed clinician." *Id.* ¶ 94. The E.V. Resolution Agreement provided that "the dates for the evaluation must be set within thirty days (30) of signing of this resolution agreement," that is, by March 11, 2021. *Id.*

¶¶ 94, 95.  The DOE additionally agreed to implement a new IEP and to provide 600 tutoring hours.  *Id.*

However, the speech IEE date was not set within thirty days.  *Id.* ¶ 95.  In early March 2021, counsel for E.V. and S.V. contacted an independent speech-language evaluator ("Provider 3").  *Id.* ¶ 96.  However, Plaintiffs state, "Provider 3 did not agree to accept the case for a month" because of Provider 3's experience with the DOE's systemic delays in providing payment for IEE evaluations.  *Id.*

Plaintiffs allege that the DOE's "delay in agreeing to fund and paying a provider to perform an evaluation for E.V. led to a failure to provide E.V. with the services he was entitled to as a result of his disability, and those services which he requires in order to participate in and benefit from the educational system[.]"  *Id.* ¶ 98.  Specifically, Plaintiffs allege denials of a FAPE both before and after the E.V. Resolution Agreement was executed.  First, they state:

> From the date S.V. and E.V.'s counsel submitted its DPC in October 2020 through at least February 2021, when the E.V. Resolution Agreement was executed, E.V. did not receive necessary special education services, including more supportive speech-language therapy, as a result of the [DOE's] failure to provide an IEE.  (For instance, the IEE speech evaluation recommended that E.V. should receive speech services for three hours per week, with the two of the hours taking place in the form of individual speech sessions, rather than the 80 minutes per week, entirely in a group setting, that his IEP recommended at the time.)  As a result of this delay, E.V.'s school lacked access to detailed information of E.V.'s language functioning skills and speech-language delays.  E.V. fell further behind in his ability to express himself, complete assignments, and engage in school.

*Id.* ¶ 97.  Therefore, Plaintiffs argue, the DOE's "delay in ensuring . . . the IEE was timely provided at public expense denied E.V. a FAPE and caused him to fall further behind grade level with reading."  *Id.* ¶ 99.

Second, Plaintiffs allege the DOE further denied E.V. a FAPE for at least "one additional month" between execution of the E.V. Resolution Agreement and the IEE being scheduled, as the delay in scheduling E.V.'s IEE was "a direct result of the [DOE's]

failure to timely pay Provider 3 for a prior IEE and caused E.V. substantial educational harm." *Id.* ¶ 100.

Plaintiffs further claim that, "[i]n its failure to act, the [DOE] acted with deliberate indifference to the strong likelihood that E.V.'s right to a [FAPE] would be violated through its delay in timely compensating Provider 3." *Id.* ¶ 101.

    *c.  K.W.H.*

K.W.H. is a nine-year-old who identifies as Bengali-American and is in the fourth grade. *Id.* ¶ 66. K.W.H. currently attends a state-approved non-public school. *Id.* ¶ 72. K.W.H. was born in Bangladesh; he was less than two years old when his family immigrated to the United States. *Id.* ¶ 67. In 2018, when K.W.H. was four years old, he was diagnosed with Autism Spectrum Disorder. *Id.* ¶ 68. K.W.H. exhibits significant difficulties reading and completing tasks independently, and he struggles with socializing, sharing, and communicating with same-age peers. *Id.* ¶ 68. K.W.H. is largely nonverbal. *Id.*

K.W.H. first received an IEP halfway through kindergarten, despite pre-school evaluations conducted months earlier indicating that K.W.H. needed special education intervention. *Id.* ¶ 69. In order to fully participate in school, K.W.H. requires, among other things, a "specialized, supportive setting" and AT. *Id.* ¶ 71. To date, K.W.H. has received some special education services. *Id.*

K.M.S.H. is K.W.H.'s parent. *Id.* ¶ 67. K.W.H.'s parents primarily speak Bengali. *Id.*

In May 2020, K.M.S.H. requested an independent bilingual (Bengali-English)[2] neuropsychological evaluation for K.W.H. *Id.* ¶ 72. K.W.H. is required to have triennial evaluations, and it is recommended that he have neuropsychological testing even more frequently. *Id.* ¶ 73. At the time of K.M.S.H.'s May 2020 request, K.W.H.'s prior formal

---

[2] K.W.H. required a Bengali-English bilingual neuropsychologist to properly assess and communicate with him to ensure he received the necessary special education and related services. *Id.*

cognitive testing had been conducted in December 2018, and his prior speech-language and OT evaluations had been conducted in February 2018. *Id.*

For over seven months after K.M.S.H.'s May 2020 request, the DOE failed to provide the evaluation. *Id.* ¶ 74. K.W.H.'s parents "grew increasingly concerned about, among other things, the [DOE's] delay in providing K.W.H. the neuropsychological evaluation they had requested." *Id.* ¶ 75.

On January 4, 2021, K.W.H.'s parents filed a DPC against the DOE, asking the Impartial Hearing Officer to find that K.W.H. was denied a FAPE for the 2018–2019, 2019–2020, and 2020–2021 school years, and requesting that the DOE pay for K.W.H. to receive an independent bilingual neuropsychological evaluation by a provider of the parent's choosing. *Id.*

On February 3, 2021, the DOE and K.W.H. partially resolved K.W.H.'s claims by entering into a Resolution Agreement (the "K.W.H. Resolution Agreement"), which is "legally binding and [] enforceable in any . . . district court of the United States." *Id.* ¶ 76. In the K.W.H. Resolution Agreement, the DOE agreed to pay for an independent "Bengali Neuropsychological evaluation" for K.W.H, at a cost of $6,500. *Id.* ¶ 77. Plaintiffs provide that "[t]he availability of Bengali-English bilingual neuropsychologists is limited. In fact, K.W.H.'s parents are aware of only one Bengali-speaking neuropsychologist in the New York City area that could provide the necessary evaluation to K.W.H." *Id.* ¶ 78.

On May 21, 2021, K.W.H.'s neuropsychologist ("Provider 2") completed her evaluation, and she submitted the requisite forms for payment to the DOE a few days thereafter. *Id.* ¶ 79. However, the DOE did not remit payment to Provider 2 until November 2021, and "only after numerous follow-up efforts with the [DOE] by K.W.H.'s counsel and the neuropsychologist." *Id.* Plaintiffs allege that, due to the DOE's approximately six-month delay in paying Provider 2 for her evaluation of K.W.H., "Provider 2 has experienced significant stress given her other financial commitments and

expenses." *Id.* Further, Plaintiffs state that "[w]hile this payment delay and other payment delays she has experienced with the [DOE] have not yet led Provider 2 to turn away [DOE] students, Provider 2 reports that the delays have weighed on her mind in a negative fashion." *Id.*

Plaintiffs allege that the DOE's delays in agreeing to fund and in paying a provider to perform a neuropsychological evaluation for K.W.H. resulted in a failure to provide K.W.H. both the services he was entitled to, as well as crucial cognitive information regarding the nature of his disability. *Id.* ¶ 80. Specifically, Plaintiffs argue:

> From May 2020, when K.W.H. initially requested the neuropsychological evaluation, through at least February 2021, when the K.W.H. Resolution Agreement was executed, K.W.H. did not receive necessary special education services, including sufficiently frequent speech-language therapy, counseling, and an augmentative communication device. For example, the bilingual neuropsychological evaluation recommended that K.W.H. should receive speech four times per week, with at least half of the sessions taking place individually, rather than just three times per week, with only one individual session, which his IEP recommended at the time. As a result of the delay in obtaining an IEE, K.W.H.'s school lacked cognitive information on his areas of strength and difficulty for months.

*Id.* Further, Plaintiffs allege that the DOE "often will not hold an IEP meeting until all outstanding evaluations are completed." *Id.* ¶ 81. Therefore, Plaintiffs claim, the DOE's "delay in agreeing to fund the IEE denied K.W.H. a FAPE and caused him to suffer substantial educational harm." *Id.* ¶ 82.

Additionally, Plaintiffs claim that the DOE's delay in remunerating Provider 2 for her IEE "resulted in the denial of a FAPE to K.W.H. until November 2021 because until then, the evaluation was not provided at 'public expense.'" *Id.* ¶ 83.[3]

Finally, Plaintiffs state that the DOE's delay in paying independent evaluators like Provider 2 "significantly narrows the pool of evaluators" who can provide IEEs—the

---

[3] In Plaintiffs' memorandum of law in opposition to the motion to dismiss, they argue that the DOE's failure to timely compensate evaluators constituted a violation of its obligation to provide IEE's "at public expense," and that this was one of many procedural violations which, taken together, deprived Plaintiffs of their educational rights under the IDEA. Doc. 77 at 17–18.

very IEEs that the DOE has agreed to fund in Resolutions Agreements—to the detriment of students with disabilities, especially those in need of bilingual evaluators, which are in particularly short supply.  *Id.* ¶ 84.

### B. Procedural History

In October 2021, prior to the commencement of the instant case, counsel for Plaintiffs sent a letter to representatives of the DOE explaining that "students with disabilities face unacceptably long delays in obtaining [IEEs], DOE evaluations, and special education services" and that "independent providers have faced months-long delays in receiving payment for evaluations and services rendered."  *Id.* ¶ 113 (alteration in original).  In that letter, Plaintiffs provided specific examples of students and providers that have suffered from these delays, and it invited the DOE to work with Plaintiffs' counsel to devise a solution for these issues.  *Id.*  However, Plaintiffs state: "Unfortunately, despite multiple efforts at constructive engagement and dialogue by counsel for Plaintiffs to resolve the issues identified in the October 2021 letter, as well as subsequent correspondence, the [DOE] has failed to act in a manner consistent with its statutory and other legal obligations."  *Id.*

On April 17, 2023, Plaintiffs filed their complaint in this case, alleging that Defendants violated the IDEA, the New York Education Law, Section 504, and the ADA, and that they breached their contracts with Plaintiffs.  Doc. 1.  Plaintiffs seek:  (1) certification as a Rule 23(b)(2) class action; (2) a declaration that Defendants violated the IDEA, the New York Education Law, Section 504, and the ADA; (3) a preliminary injunction ordering Defendants to comply with the IDEA, the New York Education Law, Section 504, and the ADA, and to identify all class members; (4) an order requiring Defendants to propose a compliance plan, requiring Defendants to submit monthly compliance reports to the Court, ordering compensatory education and other equitable relief, and retaining jurisdiction of this action; (5) the appointment of a special master or independent monitor to oversee and monitor Defendants' compliance with the Court's

order and with the agreed-upon compliance plan; and (6) an award of disbursements, costs, and attorneys' fees. *Id.* at 33–34.

On June 23, 2023, Defendants answered the complaint. Doc. 20. Following an initial pre-trial conference held on September 5, 2023, the parties began discovery.

On February 21, 2025, Defendants filed the instant motion to dismiss the complaint pursuant to Rule 12(b)(1), on grounds that Plaintiffs lack standing and that they failed to exhaust administrative remedies. Doc. 65. In the alternative, Defendants move to dismiss pursuant to Rule 12(c), on grounds that Plaintiffs fail to state a claim under the IDEA and New York Education Law,[4] Section 504, and the ADA. *Id.* Defendants additionally move to dismiss Plaintiffs' state breach of contract claim, and they argue that the Court should not grant leave for Plaintiffs to amend their complaint. *Id.* On May 13, 2025, the Court heard oral argument on the motion to dismiss.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (citation omitted) (describing subject-matter jurisdiction as the "threshold question"). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). "Because standing is challenged on the basis of the pleadings, [the Court] accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [plaintiff]." *Connecticut v. Physicians Health*

---

[4] Defendants treat the IDEA and New York Education Law as one and the same for purposes of their motion to dismiss, referring to them collectively as "IDEA." *See* Doc. 66 at 1.

*Services of Connecticut Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (internal quotation marks and citation omitted).  However, the burden remains on the plaintiff, as the party invoking federal jurisdiction, to establish its standing as the proper party to bring an action. *Selevan v. N.Y. Thruway Authority*, 584 F.3d 82, 89 (2d Cir. 2009) (citation omitted); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations marks and citation omitted) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record[,]" and if the plaintiff fails to "clearly [] allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute," he does not have standing under Article III.).

In resolving a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), a district court may consider evidence outside the pleadings.  *Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).

### B. Rule 12(c)

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The Court applies the same standard of review to a Rule 12(c) motion as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 301 (2d Cir. 2021).  Accordingly, a motion for judgment on the pleadings should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law."  *Burns Int'l Security Services, Inc. v. Int'l Union, United Plant Guard Workers of America (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam).  Judgment on the pleadings is appropriate only if, drawing all reasonable inferences in favor of the non-moving party, it is apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to relief.  *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  In considering a Rule 12(c) motion, courts should assume all the well-pleaded factual allegations in the

non-moving party's pleadings to be true.  *Faber v. Metropolitan Life Insurance Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

In adjudicating a motion for judgment on the pleadings, the Court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).  The Court also considers any documents incorporated into the complaint by reference or integral to the complaint, provided there is no dispute regarding their authenticity, accuracy, or relevance.  *Id.*; *see also Piazza v. Florida Union Free School District*, 777 F.Supp.2d 669, 677 (S.D.N.Y. 2011).  Finally, the Court accepts as true the complaint's factual allegations and draws all reasonable inferences in the plaintiff's favor.  *Caplaw Enterprises*, 448 F.3d at 521.

## IV.    DISCUSSION

### A.   12(b)(1)

Defendants argue that the Court lacks subject matter jurisdiction because Plaintiffs lack standing, and because "Plaintiffs have not exhausted the administrative remedies required to invoke this Court's subject-matter jurisdiction over their claims." Doc. 66 at 1.

#### 1.   Article III Standing

A standing issue may be raised at any stage in a litigation, *Carter v. HealthPort Technologies*, *LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)), and "[t]he party invoking federal jurisdiction bears the burden of establishing the[] elements" of Article III standing.  *Id.* (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "When standing is challenged on the basis of the pleadings, we 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining

party.'" *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir. 1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

"Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.' That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 273 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)). "[I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Communications Co., L.P.*, 554 U.S. at 273–74 (internal quotation marks and alterations omitted) (quoting *Lujan*, 504 U.S. at 560–61).

At issue here are elements 1 and 3 of standing: injury-in-fact and redressability.

*a. Injury-in-Fact*

To establish the first element of standing, injury-in-fact, the plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [he] is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016); *see also Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010). "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." *Nicosia*, 834 F.3d at 239 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)).

Here, Plaintiffs have pleaded injury-in-fact based on a future risk of injury, by establishing that Student Plaintiffs are substantially likely to suffer future harm from the DOE's systemic delays.

First, Plaintiffs provide that Student Plaintiffs will need reevaluations in the future, because based on their ages and disabilities, they will remain in the special education system. D.W. is a 12-year-old who, due to her disabilities, struggles with inattentiveness, impulsivity, and self-regulation, and has "demonstrate[ed] issues relating to grasping and navigating safely, due to toe-walking." Doc. 1 ¶¶ 53, 54, 56. D.W. has historically needed OT and PT evaluations, and she has depended on AT. *See id.* ¶ 55. E.V. is a 16-year-old who requires speech therapy, counseling, and one-on-one tutoring in order to fully participate in school, and whose disabilities have manifested, for example, in a second-grade reading level when he was in eighth grade. *Id.* ¶¶ 85, 87, 88, 91. K.W.H. is a nine-year-old who, due to Autism Spectrum Disorder, struggles with reading, socializing, communicating, and sharing, and is largely nonverbal. *Id.* ¶ 68. Based on these facts, Plaintiffs have sufficiently supported their claim that, "due to their ages and the enduring nature of their disabilities," the Student Plaintiffs will continue to require special education services. Doc. 77 at 10. Plaintiffs will therefore continue needing evaluations, because the IDEA requires that students be reevaluated for services at least once every three years, Doc. 1 ¶ 41; 20 U.S.C. § 1414(a)(2)(B)(ii), and they may continue seeking IEEs.

Second, Plaintiffs have established that the DOE's systemic delays in providing these evaluations and in funding IEEs make it substantially likely that Plaintiffs will suffer educational harms in the future. Plaintiffs allege that, since at least 2018, Defendants have exhibited "egregious delays in (i) providing [DOE Evaluations] and in (ii) responding to requests for [IEEs]." Doc. 1 ¶ 3. Although Plaintiffs do not allege that the DOE has an official policy of providing untimely evaluations, they claim the DOE's "systemic delays" are so widespread that hundreds of families have been "forced" to file

DPCs in order to obtain evaluations and IEP related services. *Id.* ¶ 5. The likelihood that Plaintiffs will be affected by these systemic issues in the future is sufficiently strong to confer standing. *See, e.g.*, *LV v. New York City Dep't of Education*, No. 3 Civ. 9917 (RJH), 2005 WL 2298173, at *4, *5 n.4 (S.D.N.Y. Sept. 20, 2005) (emphasis in original) (in case involving challenges to "defendants' purported practices and policies in failing to timely implement disabled students' IHO orders on a *system-wide* basis," noting Plaintiffs had standing because there was "a 'reasonable expectation' that plaintiffs could be subject to the same conduct again based on (1) plaintiffs' continued eligibility for educational services under the IDEA; (2) the nature of their disabilities; and (3) allegations that the delays are due to defendants' systemic failure to ensure timely enforcement."); *see also Mayer v. Wing*, 922 F. Supp. 902, 907 (S.D.N.Y. 1996) (where Medicaid recipients of home care services challenged the reduction of services, finding that "even if Defendants were right that only an actual reduction in [home] services can constitute an injury, Plaintiffs would still have standing" based on a "'substantial likelihood' that these individuals will have their aid cut in the future," because "each recipient of home services must be reauthorized [for the services] at least once a year," and these reauthorizations "frequently result in notices of reduction"); *see also J.F. v. Adams*, No. 21 Civ. 11150 (ALC), 2024 WL 1348524, at *5 (S.D.N.Y. Mar. 29, 2024) (finding Plaintiffs had standing to "seek system-wide declaratory and injunctive relief . . . to prevent risk of future harm," where they alleged "the due process hearing system [was] tainted" by biased IHOs because the City compensated the IHOs, and rejecting Defendants' argument that Plaintiffs' injury was too speculative for standing because Plaintiffs had not "been subject to an adverse decision of an . . . IHO," nor "alleged an IHO's specific bias or partiality.").

Defendants claim that Plaintiffs rely on the erroneous assumption that any IDEA-mandated reevaluation will necessarily result in a need for additional assessments, such as "the highly specialized independent evaluations [IEEs] described in the Complaint."

Doc. 80 at 2. Therefore, Defendants argue, the Court must "engage in multiple layers of speculation" to arrive at the conclusion that Defendants will be injured in a similar way again. *Id.*[5] The Court disagrees. Given Plaintiffs' ongoing need for special education and the specific services they depend on, *see, e.g.*, Doc. 1 ¶¶ 71, 91, the likelihood that they will request more IEEs and ultimately suffer harm from the DOE's systemic delays in funding them is based on a highly plausible chain of events. *Cf. Lyons*, 461 U.S. at 105–06 (finding no standing based on a speculative potential of "future injury from the use of the chokeholds by police officers," because Plaintiff would have to "again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.").[6] In any event, Plaintiffs do not allege systemic delays with respect to IEEs alone; they allege "systemic unlawful delays" in the DOE's provision of DOE evaluations—those mandated at least once every three years—as well. Doc. 1 ¶¶ 146, 154.

In sum, the Court is satisfied that, based on Plaintiffs' likelihood of remaining in the special education system, as well as the DOE's ongoing delays in ensuring the provision of the evaluations and assessments Plaintiffs expect to depend on, their expectations of future harm are not "speculative." *See, e.g.*, *Ortiz v. Ciox Health LLC*, No. 17 Civ. 4039 (DLC), 2018 WL 1033237, at *2 (S.D.N.Y. Feb. 22, 2018) ("[T]he FAC

---

[5] Defendants additionally argue that "[t]he IDEA does not provide [an] absolute right to assessments" in the first place. Doc. 80 at 3. However, Defendants use "assessment" narrowly, to refer only to "diagnostic instruments," whereas they use "evaluation" to refer to the broader "process of evaluating a child." Doc. 66 at 5 n.3. The IDEA does require evaluations at least once every three years, §§ 1414(a)(2)(B)(ii), (d)(4)(a), and Plaintiffs allege delays as to evaluations and assessments alike.

[6] Defendants also incorrectly extrapolate from *Lyons* that "Plaintiffs here must make the 'incredible assertion' that all [DOE] employees *always* delay timely evaluations for IDEA students." Doc. 80 at 6 (emphasis in original) (quoting *Lyons*, 461 U.S. at 106). *See, e.g.*, *Roe v. City of New York*, 151 F. Supp. 2d 495, 504, 510 (S.D.N.Y. 2001) (citation omitted) (stating that "in contrast to *Lyons*, the facts alleged here constitute more than a 'chain of contingencies making the likelihood of future harm speculative,'" and finding standing based on a threat of future unlawful arrests because plaintiffs alleged the NYPD had a pattern and practice of illegally targeting members of state-authorized needle exchange programs ("NEPs") in "known drug areas," and "the plaintiff NEP members frequent[ed] such areas").

alleges that 'Defendants have engaged and continue to engage in an ongoing practice of overcharging persons such as Plaintiff for copies of their medical records.' It is plausible that [Plaintiff] will need to obtain her . . . medical records in the future, and she accordingly has standing to pursue individual injunctive relief.").

The Court similarly declines to dismiss the action on mootness grounds—which the parties discuss only briefly—as here, there is "a reasonable expectation," not "a mere . . . theoretical possibility," that Plaintiffs will be subjected to the same action by Defendants in the future. *Lillbask ex rel. Mauclaire v. State of Connecticut Dep't of Education*, 397 F.3d 77, 86 (2d Cir. 2005); *see, e.g.*, *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992) (in case concerning potential bias of hearing officers, holding case was not moot even though Plaintiff did not have a hearing pending before a hearing officer, since "the threat of future denial of an impartial hearing [was] sufficiently real," to urge a finding that Plaintiff "retain[ed] enough of a personal stake in the outcome for [the Court] to retain jurisdiction over th[e] case.").

    *b. Redressability*

To show redressability, a plaintiff must establish it is "'likely,' not speculative, that a favorable decision by a court will redress the injury." *National Resources Defense Council v. National Highway Traffic Safety Administration*, 894 F.3d 95, 103 (2d Cir. 2018) (quoting *Lujan*, 504 U.S. at 560–61). "Plaintiffs' injuries are redressable if their requested relief can compensate them for their losses or 'eliminate any effects caused by [the] defendant[s'] challenged conduct.'" *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 263 (E.D.N.Y. 2021) (quoting *Janfeshan v. U.S. Customs & Border Protection*, No. 16 Civ. 6915 (ARR) (LB), 2017 WL 3972461, at *6 (E.D.N.Y. Aug. 21, 2017).

Defendants argue that Plaintiffs fail to establish a harm that would be "redressed by a favorable decision," because "as of the filing of the Complaint, Plaintiffs suffered no harm that a favorable judgment could remedy." Doc. 66 at 11. Specifically, Defendants state that "the Complaint makes clear that the Resolution Agreements have been fully

performed between the Plaintiffs and the [DOE]," because the DOE ultimately provided the allegedly delayed evaluations and IEE payments.  *Id.* at 10.

This argument fails as to redressability for the same reason that it fails as to injury-in-fact.  *See* Doc. 77 at 12.  Plaintiffs' theory of standing is not that they suffered from an injury at the time the complaint was filed, but rather that they previously suffered a concrete injury based on the DOE's delays, and that the DOE's "chronic delays in providing and paying for special education evaluations," will harm Plaintiffs again in the future "given that [Plaintiffs] must receive periodic reevaluations."  *Id.* at 13; *see also id.* at 11.  Therefore, that the DOE already provided or funded the specific, allegedly delayed evaluations identified in the complaint does not defeat standing.  Plaintiffs sufficiently plead redressability because they seek to redress, through injunctive relief, the DOE's broader, allegedly systemic violations under state and federal disability rights laws.  *Id.* at 12; *see Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185–86 (2000) ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress."); *see, e.g.*, *Heldman on Behalf of T.H.*, 962 F.2d at 157 (where plaintiff sought to enjoin a statute that allowed the board of education to select hearing officers, finding redressability because "the prospective relief will prevent future violations of [plaintiff's] right to an impartial hearing," even though plaintiff had "no hearing pending before a local hearing officer").[7]

---

[7] Defendants also briefly argue against redressability by claiming that any educational progress delays and their negative effects were already addressed in Plaintiffs' post-evaluation IEPs.  Doc. 66 at 12.  Plaintiffs contest that factual assertion, and they argue that in any event, an injunction is essential to preventing future delays that "will disrupt Plaintiffs' next iteration of IEPs, perpetuating a cycle of educational harm," and to ensuring "systemic change that protects [the DOE's] students from harm to their educational progress."  Doc. 77 at 13.

### 2. Exhaustion

The IDEA contains an exhaustion requirement such that failure to exhaust "deprives [a] court of subject matter jurisdiction." *Murphy v. Arlington Central School District Board of Education*, 297 F.3d 195, 199 (2d Cir. 2002); *see also Ventura de Paulino v. N.Y.C. Dep't of Education*, 959 F.3d 519, 530 (2d Cir. 2020) (citing 20 U.S.C. § 1415(i)(2)(A)) ("The IDEA requires that any available administrative remedies be exhausted before a lawsuit is filed in federal court."). But the exhaustion requirement is "not an inflexible rule." *Murphy*, 297 F.3d at 199 (citing *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir. 1987)). Exhaustion is not required when "(1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies." *Id.* (citing *Tirozzi*, 832 F.2d at 756). "The Second Circuit excuses the requirement to exhaust administrative remedies where plaintiffs allege systemic violations." *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 293 (S.D.N.Y. 2007); *see, e.g.*, *id.* at 294–95 (finding that defendants' alleged systemic failure to properly evaluate and provide services, was the type of systemic violation that falls under the "futility exception"); *see also J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 113 (2d Cir. 2004) (collecting cases in which the Second Circuit "has previously excused exhaustion of administrative remedies in cases that included allegations of systemic violations," and noting that "[i]n each of these cases, th[e] [Second Circuit] concluded it would be futile to complete the administrative review process because the hearing officer had no power to correct the violation").

Here, as previously discussed, Plaintiffs claim Defendants are responsible for "systemic unlawful delays" in providing DOE evaluations and in paying evaluators and service providers, and that hundreds of families have had to file DPCs, as a result of delays, since at least 2018. Doc. 1 ¶¶ 5, 146, 154. Plaintiffs do more than merely "affix[] a conclusory 'SYSTEMIC' label to their allegations," as Defendants claim. Doc. 80 at 9.

Rather, Plaintiffs break down how the DOE's patterns and practices result in widespread and persistent delays. For example, Plaintiffs explain that "[f]amilies that request an IEE . . . often receive no response from . . . their child's school, which is responsible for providing a response," and that this "lack of timely response, often for weeks or months, forces parents to file a DPC against the [DOE]." Doc. 1 ¶ 5. Then, even after the DOE agrees to settle or partially settle families' claims by promising evaluations, the DOE does not abide by the timelines it itself negotiated in those agreements. *Id.* ¶ 6. The DOE's failure to timely pay independent providers "further compounds the systemic harm alleged," because the payment issues "caus[e] such providers to prefer to work with higher-income families with students who can afford to pay out-of-pocket," thereby "limiting the pool of providers who are willing to contract with the City of New York to deliver critical special education services." *Id.* ¶ 7, 8.

Taking as true these allegations, as well as Plaintiffs' claims that the DOE's delays have spanned multiple years and have affected "hundreds of families," *id.* ¶ 5, the Court finds that Plaintiffs have pleaded sufficient facts that "support an inference that th[e] denial[s] resulted from a broad policy or practice." *F.C. v. New York City Dep't of Education*, No. 15 Civ. 6045 (PAE), 2016 WL 8716232, at *9 (S.D.N.Y. Aug. 5, 2016); *see, e.g.*, *Attica Central Schools*, 386 F.3d at 112, 115 (finding the district court correctly applied the "'systemic violation' exemption from the exhaustion requirement," where the "allegations of systemic problems" in the complaint included the "failure to perform timely evaluations and reevaluations of disabled children" and "failure to perform legally required responsibilities in a timely manner"); *cf. F.C.*, 2016 WL 8716232, at *8–9 (finding that plaintiffs plausibly pleaded the existence of a systemic policy where defendants' "categorical refusal[s]" to provide certain services over multiple school years provided a "degree of confirmation that [they] ha[d] a systemic policy of not providing such support services"). Moreover, Plaintiffs describe a pattern of delays and associated "polycentric" issues that are "due in part to 'the bureaucratic infrastructure

involved in the evaluation . . . process,'" and which should be resolved by a "structural approach, rather than by more traditional adjudication." *Jose P. v. Ambach*, 669 F.2d 865, 869 (2d Cir. 1982).[8]

Defendants separately argue that they have already addressed any "educational progress delays" and "attendant negative effects" in the "post-evaluation IEPs described in the Complaint." Doc. 66 at 12. Therefore, Defendants argue, "[i]f Plaintiffs are alleging that these IEPs failed to meet Plaintiffs' educational needs," then Plaintiffs should have filed a DPC or they should now make a showing that challenging those post-evaluation IEPs at the administrative level would have been futile. *Id.*; *see also id.* at 7. However, although they contest Defendants' characterization that the post-evaluation IEPs cured the inadequacies of Plaintiffs' pre-evaluation IEPs, Doc. 77 at 13, and although they advocate that an injunction would prevent further systemic delays which would disrupt the "next iteration of IEPs," Plaintiffs are not directly challenging the post-evaluation IEPs. *See* Doc. 77 at 19 and n.11. Therefore, the Court finds no failure to exhaust administrative remedies as to an IEP-specific challenge.[9]

### B.  12(c)

Having found that the Court has subject matter jurisdiction over the case, the Court turns to Defendants' alternative arguments that Plaintiffs fail to state a claim under the IDEA, Section 504, and the ADA.

#### 1.  IDEA

"[A] school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at

---

[8] Defendants argue that, even if Plaintiffs' claims are construed as asserting a systemic violation, Plaintiffs could obtain compensatory relief—which is a form of individualized relief—through the administrative hearing process. *See* Doc. 80 at 8, 9 (citing *J.Z.*, 281 F. Supp. 3d at 362 and *Montalvan v. Banks*, 707 F. Supp. 3d 417, 434 (S.D.N.Y. 2023)). However, Defendants make no mention of whether Plaintiffs could additionally obtain declaratory and injunctive relief from the administrative process, nor do they argue that compensatory relief, alone, could remediate the systemic issues at the core of Plaintiffs' claims.

[9] As previously discussed, the Court also does not find a redressability issue stemming from the post-evaluation IEPs. *See supra* n.7.

399.  "In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive."  *L.O. v. N.Y.C. Dep't of Education*, 822 F.3d 95, 109 (2d Cir. 2016) (citation omitted).  Here, the Court finds that Plaintiffs have sufficiently pleaded both procedural and substantive violations.

    *a.  Procedural Inquiry*

The procedural inquiry is "no mere formality," since "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *Walczak*, 142 F.3d at 129.  At the same time, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA."  *A.C. ex rel. M.C. v. Board of Education of The Chappaqua Central School District*, 553 F.3d 165, 172 (2d Cir. 2009).  A procedural violation renders an IEP legally inadequate only when the violation (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits."  *Cornett v. Banks*, No. 23 Civ. 6893 (MMG), 2025 WL 712799, at *6 (S.D.N.Y. Mar. 5, 2025) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

When developing a student's IEP, the CSE must review "existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers."  20 U.S.C. § 1414(c)(1)(A); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(i).  "[O]n the basis of that review, and input from the child's parents," the CSE must then "identify what additional data, if any, are needed to determine," among other things, "the educational needs of the child," "the present levels of academic achievement and related developmental needs of the child," and "whether the child needs special education and related services."  20 U.S.C. § 1414(c)(1)(B); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(ii).  If the CSE determines that "no

additional data are needed to determine . . . the child's educational needs," the district is not "required to conduct such an assessment unless requested by the child's parents."  20 U.S.C. § 1414(c)(4); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(iv).  In other words, "[a]ny additional assessments need only be conducted if found necessary to fill in gaps in the initial review of existing evaluation data."  *D.B. ex rel. E.B. v. N.Y.C. Dep't of Education*, 966 F. Supp. 2d 315, 329–30 (S.D.N.Y. 2013); *see also T.F. ex rel. M.F. v. N.Y.C. Dep't of Education,* No. 14 Civ. 3401 (WHP), 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015).

        Here, Plaintiffs have sufficiently pleaded that Defendants' delays resulted in the IEP team not having necessary information concerning the children's then-current educational needs, and that this precluded meaningful parental participation, denied the students a FAPE, and deprived them of educational benefits.  *See, e.g.*, *R.E.*, 694 F.3d at 190 ("The failure to conduct an adequate [functional behavioral assessment] is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all.").  Specifically, the DOE's failures to timely provide evaluations and compensate independent evaluators ultimately "deprived the Plaintiff-parents of critical information, effectively preventing them from making informed decisions about their children's education."[10]  Doc. 77 at 17; *see B.P. v. New York City Dep't of Education*, No. 14 CIV. 1822 LGS, 2014 WL 6808130, at *9 (S.D.N.Y. Dec. 3, 2014) (citation omitted) ("Parental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation."), *aff'd*, 634 F. App'x 845 (2d Cir. 2015).

---

[10] Defendants argue that "payment processes to evaluators are not actionable under the IDEA."  Doc. 66 at 15.  However, Plaintiffs do not claim that the payment processes themselves substantively violated IDEA; they argue that Defendants' delays in paying independent providers contributed to delayed IEEs, which in turn hampered families' access to current information.  At this stage, the Court finds that Defendants' delayed payments contributed to the procedural violations that "cumulatively result[ed] in the denial of a FAPE."  *R.E.*, 694 F.3d at 190.

Moreover, because of the delays, the IEPs lacked relevant information tailored to the students' needs.  Doc. 77 at 15.  Indeed, the complaint reflects that the evaluations and IEEs ultimately recommended additional services for the Student Plaintiffs; for example, D.W.'s AT evaluation "concluded that D.W. required an AT device," and E.V.'s speech evaluation as well as K.W.H.'s neuropsychological evaluation each recommended more individual speech sessions to be conducted on a weekly basis.  Doc. 1 ¶¶ 62, 80, 97.  Had Plaintiffs had access to these recommendations earlier, their IEPs would have plausibly incorporated them, and Plaintiffs could have begun benefitting from those services at an earlier point in time.  Therefore, Plaintiffs have plausibly pleaded that Defendants' procedural violations impinged on the parent Plaintiffs' meaningful participation, deprived the Student Plaintiffs of their educational rights, and denied them a FAPE.

    *b.  Substantive Inquiry*

The substantive inquiry considers whether an IEP is "reasonably calculated to enable the child to receive educational benefits."  *R.E.*, 694 F.3d at 190 (internal citations and alteration omitted).  An IEP must be "likely to produce progress, not regression," and afford the student with an opportunity to achieve greater than mere "trivial advancement."  *Cerra*, 427 F.3d at 192, 195 (quoting *Walczak*, 142 F.3d at 129–30).

Plaintiffs have sufficiently pleaded that the pre-evaluation IEPs were substantively inadequate.  Defendants incorrectly state that Plaintiffs are "making the illogical argument that that their assessments were available to the *pre*-assessment IEP teams, and that those *pre*-assessment IEP teams ignored the reports."  Doc. 80 at 10 (emphasis in original).  To the contrary, Plaintiffs argue that the assessments and evaluations were *not* available to those IEP teams because of Defendants' delays, and that as a result, the IEP teams did not have updated information necessary for adequately tailoring the IEPs to the students' contemporary educational needs.  *See* Doc. 77 at 15–16, 19.  As a result, "D.W. was left without an [AT] device . . . which caused her to fall behind in school," "E.V. lacked necessary speech therapy for at least four months," which "exacerbated his

struggles in school," and K.W.H. "received fewer services than he required." *Id.* at 16. Plaintiffs allege that the DOE's "systemic, months-long delays in providing evaluations to begin with were delays so severe that they rendered entire IEPs outdated and deprived Plaintiffs of substantively adequate IEPs." *Id.* at 19; *cf. D.B. v. New York City Dep't of Education*, 966 F. Supp. 2d 315, 330, 331 (S.D.N.Y. 2013) (at summary judgment, finding that the DOE's "fail[ure] to conduct a current reevaluation of the Student did not deny the Student a FAPE," because the CSE nonetheless "had sufficient and accurate information to understand the Student's present levels of performance in preparing the IEP" based on "a number of sufficient evaluations, reports, and observations").

In sum, Plaintiffs have sufficiently pleaded both procedural and substantive violations of the IDEA, and thus their IDEA and New York Education Law claims withstand dismissal.

### 2. *Section 504 and ADA*

Section 504 and the ADA are regularly considered in tandem because they have similar requirements. *J.Z. v. New York City Dep't of Education*, 281 F. Supp. 3d 352, 356 (S.D.N.Y. 2017) (citing *Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.")). "To plead a claim under either statute, Plaintiffs must show that Defendants acted in bad faith or with gross misjudgment when administering disability services." *J.L. on behalf of J.P. v. New York City Dep't of Education*, 324 F. Supp. 3d 455, 467 (S.D.N.Y. 2018) (quoting *S.W. by J.W.*, 528 F. Supp. 2d at 290).

At this stage, the Court finds Plaintiffs have sufficiently pleaded Section 504 and ADA claims. Plaintiffs argue that Defendants' failures "to timely ensure the provision of special education evaluations" amount to "gross misjudgment." Doc. 77 at 21. They argue that Defendants have been aware, for years, of the "serious harm" that their systemic delays cause families, both because hundreds of families file DPCs each year,

and because Plaintiffs described the systemic issues and their harms in an October 2021 letter to the DOE. *Id.* (citing Doc. 1 ¶¶ 5–6, 32–34, 58, 75, 77, 92). Notwithstanding this awareness, Plaintiffs argue, Defendants have taken "no corrective action to ensure compliance with the law." *Id.*

Taking Plaintiffs' well-pleaded factual allegations to be true, *Faber*, 648 F.3d at 104, and drawing all reasonable inferences in their favor, *Beerman*, 18 F.3d at 150, it is plausible that Plaintiffs will be able to prove that Defendants' failures stem from "gross misjudgment." Plaintiffs cite to two cases which are instructive: *S.W. by J.W. v. Warren* and *J.L. on behalf of J.P. v. New York City Dep't of Education*. In *S.W. by J.W. v. Warren*, the court denied a motion to dismiss a Section 504 claim based on a finding of gross misjudgment. 528 F. Supp. 2d 282, 291–92 (S.D.N.Y. 2007). There, the plaintiffs alleged the DOE "repeatedly deprived children" of services required by their IEPs "for the reason that there was an insufficient number of service providers." *Id.* The court gave weight to the fact that the defendants *knew* that their policies—which limited available services without a "proper or reasonable basis"—"would result in a failure to adequately implement IEPs." *Id.* at 291. Therefore, the court concluded that in the "early stage" of a motion to dismiss, it could "infer that plaintiffs may be able to show bad faith or gross misjudgment." *Id.* In *J.L. on behalf of J.P.*, the court similarly denied a motion to dismiss Section 504 and ADA claims based on a finding of gross misjudgment. 324 F. Supp. 3d 455, 468 (S.D.N.Y. 2018). There, the court had found the complaint was "replete with allegations that DOE policies and procedures created layers of bureaucracy that made it difficult for parents of disabled children to obtain services," such as the requirement that parents contact and obtain approval from an agency within the DOE to secure porter services for a wheelchair-bound plaintiff. *Id.* at 462, 464. In determining that "gross misjudgment" was sufficiently pleaded, the court noted that "[p]laintiffs notified DOE that its policies were undermining the delivery of timely and effective services." *Id.* at 468. The court continued:

> While bureaucratic incompetence may have triggered DOE's failure to implement IEP services, it eventually morphed into a reckless disregard for [Plaintiffs'] educational needs.  This is particularly true in view of the allegations that DOE representatives were aware of the myriad failures to provide nursing and transportation services yet did nothing to remediate them. . . . In sum, the Complaint sufficiently asserts that '[d]efendants had no proper or reasonable basis for the policy limiting available services for [disabled students afflicted with severe medical conditions], knowing it would result in a failure to adequately implement IEPs established to provide' them with 'an equal opportunity to a free and adequate education.'

*Id.* (quoting *S.W. by J.W.*, 528 F. Supp. 2d at 291).

Defendants argue that Plaintiffs merely restate their IDEA claims, and that they make only conclusory allegations that the DOE's awareness of the delays are indicative of gross misjudgment.  Doc. 80 at 4; *see T.J. on behalf of B.W. v. Board of Education of Mt. Vernon City School District*, No. 17 Civ. 9592 (JCH), 2019 WL 13170168, at *16 (S.D.N.Y. Sept. 30, 2019) (emphasis in original) (dismissing ADA and Section 504 claims because the amended complaint did not make "further plausible allegations of bad faith or gross misjudgment in addition to the IDEA violation.").  However, with respect to their Section 504 and ADA claims, Plaintiffs make the additional assertion that the DOE failed to take action to ameliorate known systemic violations, and Defendants do not distinguish Plaintiffs' authority for—nor provide new authority to undermine—their contention that those allegations suffice for Section 504 and ADA claims at this stage.

### C.  State Breach of Contract Claim

In addition to the federal claims under the IDEA, Section 504, and ADA, Plaintiffs bring a state breach of contract claim, alleging that Defendants breached the Resolution Agreements between the parties.  As a threshold matter, the Court exercises supplemental jurisdiction over the state breach of contract claim because it arises from "from the same facts" as the federal IDEA claim over which the Court has original jurisdiction.  *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025). However, the Court finds that Plaintiffs do not adequately plead a state breach of contract claim.

"Under New York law, an action for breach of contract requires that a plaintiff establish '(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.'" *Donohue v. Cuomo*, 980 F.3d 53, 67 (2d Cir. 2020) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)). Here, elements (2), (3), and (4) are at issue.

As to element (2), Plaintiffs adequately performed their end of the bargain. Defendants argue that Plaintiffs' "single allegation" that they "adequately performed under the binding Resolution Agreements" is perfunctory and conclusory. Doc. 66 at 22. However, Plaintiffs state, and Defendants do not contest, that the Resolution Agreements simply required that Plaintiffs "agree[] to settle part or all of their DPCs," and Plaintiffs honored their obligation to "*refrain* from acting." Doc. 77 at 23 n.14 (emphasis in original).

As to element (3), Plaintiffs' claim that Defendants breached the E.V. Resolution Agreement is adequately pleaded, however, their claims that Defendants breached the D.W. and K.W.H. Resolution Agreements are not. At bottom, the parties' dispute as to whether there was a breach stems from their different interpretations of the Resolution Agreements. "The interpretation of a contract is a matter of law for the court." *1550 Fifth Avenue Bay Shore, LLC v. 1550 Fifth Avenue, LLC*, 297 A.D.2d 781, 783 (N.Y. App. Div. 2002) (citation omitted). Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002) (citation omitted). A contract is ambiguous only when its "terms are subject to more than one reasonable interpretation." *Zest Anchors, LLC v. Biomet 3i, LLC*, No. 23 Civ. 7232 (JLR), 2024 WL 4008164, at *6 (S.D.N.Y. Aug. 30, 2024) (citing *Universal American Corp. v. National Union Fire Insurance Co. of Pittsburgh, PA*, 37 N.E.3d 78, 80 (N.Y. 2015) (quotation marks and citation omitted)). In evaluating a motion to

dismiss, the Court must "resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distributors Corp. v. Subaru of America., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

Here, each of the three Resolution Agreements consists of tables, in which the leftmost column details the type of meeting, evaluation, program, or service that the DOE is to provide, and the rightmost column is titled "Expected Completion Date," "Expected Implementation," or "Expected Implementation Date."  *See generally* Docs. 69-1, 69-2, 69-3.  Based on the plain meaning of the term "expected," the Resolution Agreements generally provide *anticipated* timelines, not binding deadlines by which DOE *must* provide corresponding assessments or services.  Therefore, to the extent the rightmost columns contain only a date or timeframe, such as "[t]hirty days from date of execution of this agreement," Doc. 69-1 at 1, it is clear and unambiguous that the date or timeframe is merely expected, not contractually obligated.

However, certain rightmost columns in the E.V. Resolution Agreement go farther: with regards to the provision of an independent speech evaluation, the Agreement specifies, under "Expected Completion Date," that "the dates for the evaluation *must* be set within thirty days (30) of signing of this resolution agreement," Doc. 69-2 at 1 (emphasis added), and with regards to the provision of 600 hours of tutoring, it states in the "Expected Implementation" column, "Upon signing of the resolution.  *Not to exceed* a date beyond February 2024," *id.* at 2 (emphasis added).[11]  These phrases are clearly worded to impose a strict deadline.  However, because they still appear under columns titled "Expected Completion Date" and "Expected Implementation," respectively, it is not clear from the four corners of the contract whether the definitive nature of the phrases "*must be set* within thirty days" and "*[n]ot to exceed . . .* February 2024" is meant to supersede the tentative nature of the word "expected," found in the column titles.  Doc.

---

[11] Plaintiffs do not appear to claim that Defendants breached the E.V. Resolution Agreement with respect to the 600 tutoring hours, however, the Court cites the language pertaining to it as an example of certain definitive language included within the contract.

69-2 at 1, 2.  Considered as a whole, the contractual language "could suggest more than one meaning when viewed objectively by a reasonably intelligent person."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).  Because at this stage, the Court resolves contractual ambiguities in favor of Plaintiffs, *see Subaru Distributors Corp.*, 425 F.3d at 122, the Court proceeds with the interpretation that the E.V. Resolution Agreement provided a binding date certain by which the IEE had to be scheduled, and by which 600 hours of tutoring had to be provided.  Moreover, because the Court takes as true Plaintiffs' claim that the "delay in scheduling the IEE was a direct result of the [DOE's] failure to timely pay Provider 3 for a prior IEE," the Court interprets that the delay amounts to a contract breach by the DOE.[12]  Doc. 1 ¶ 100.  Therefore, the Court finds that Plaintiffs have adequately pleaded that Defendants breached the E.V. Resolution Agreement based on the failure to schedule the independent speech evaluation within the 30-day period.

However, as to element (4), Plaintiffs do not sufficiently allege contract damages.  Although Plaintiffs adequately argue that Defendants' breach caused educational harms, they have not alleged how the sought-after remedy would remediate those harms.  Plaintiffs state, even as to the breach of contract claim, that they "seek equitable relief to address Defendants' persistent failures to honor the Resolution Agreements they willingly enter into."  Doc. 77 at 24.  As discussed with respect to injury-in-fact and redressability, this relief is intended not to remediate past injuries, but rather to safeguard Plaintiffs from future injuries.  Therefore, by definition, Plaintiffs do not seek damages that would put them in the same position they would have been in had no breach occurred.  *See New*

---

[12] Defendants elsewhere argue that it was E.V.'s parent's obligation, not the DOE's, to arrange for the IEE, and that Plaintiffs' "attempt to attribute E.V.'s difficulties in arranging an assessment with Provider 3" to the DOE is unsupported.  *See* Doc. 66 at 16–17.  Plaintiffs state that Provider 3 initially declined to accept E.V.'s case due to the DOE's prior delays in paying Provider 3 for IEEs.  Doc. 1 ¶ 96; *see also* Doc. 77 at 5, 22.

*York City Housing Authority v. Housing Authority Risk Retention Group, Inc.*, 203 F.3d 145, 152 (2d Cir. 2000) ("It is a basic principle of contract law that damages are awarded to put the injured party in as good a position as it would have been without the breach."); *see also Rolex Watch U.S.A. Inc. v. Bulova Watch Co. Inc.*, No. 93 Civ. 1962 (EHN), 1993 WL 459948, at *5 (E.D.N.Y. June 17, 1993) ("New York courts have held that injunctive relief is appropriate where a monetary remedy cannot place the parties to a contract in the same position they occupied before the breach."). Therefore, Plaintiffs' claim for injunctive relief is not an adequate remedy for their breach of contract claim, and the claim is dismissed.

## V.    LEAVE TO AMEND

As a general rule, leave to amend a complaint should be freely granted. *Jin v. Metropolitan Life Insurance Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). District courts have broad discretion in deciding whether to grant leave to amend. *Pasternack v. Laboratory Corp. of America*, 892 F. Supp. 2d 540, 549 (S.D.N.Y. 2012) (citation omitted). The Court may decline to provide the opportunity to amend if the court finds that the plaintiff "cannot correct the defects in the federal claims" and therefore "any attempt to amend the pleading . . . would be futile." *Shorter v. Rice*, No. 12 Civ. 111 (JFB) (ETB), 2012 WL 1340088, at *4, *5 (E.D.N.Y. Apr. 10, 2012); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

Here, Defendants argue that amending the complaint would be futile because the complaint "affirmatively pleads the absence of an injury in fact upon which to predicate Article III standing," by admitting that Plaintiffs "had received the assessments at the heart of the Resolution Agreements" by the time they filed suit. Doc. 66 at 23. That is, Defendants reiterate their argument that Plaintiffs have failed to plead injury-in-fact, and

they argue that the complaint is "incurable" since Plaintiffs would have to contradict their admission that the assessments were ultimately provided in order to assert injury-in-fact. *Id.*

Because the Court already found against Defendants' injury-in-fact argument in determining that Plaintiffs have standing, the Court similarly finds against Defendants here. Therefore, the Court grants leave to amend.

## VI. CONCLUSION

For the reasons set forth above, the motion is GRANTED in part and DENIED in part. The Court dismisses the state breach of contract claims, however it does not dismiss the IDEA, New York Education Law, Section 504, and ADA claims.

Plaintiffs must file their Amended Complaint, if at all, by June 17, 2025.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 65.

It is SO ORDERED.

Dated:    May 27, 2025
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.